HAMLIN, Justice.
 

 In the exercise of our supervisory control (Article VII, Section 11, Louisiana Constitution of 1921, LSA), we granted a writ of review from a judgment of the Court of Appeal,
 
 [1]
 
 Parish of Orleans, affirming a judgment of,the Civil District Court for the Parish of Orleans denying plaintiff, Widow of Patrick Philip Farley, Workmen’s Compensation benefits and dismissing her suit for such.
 

 Our law and jurisprudence, LSA-R.S. 23:1231, 23:1254 — 55; Haynes v. Loffland Bros. Co., La.App., 34 So.2d 30; 215 La. 280, 40 So.2d 243; Moy v. Schuylkill Products, 209 La. 782, 25 So.2d 542; Hudson v. Central Culvert Corp., La.App., 108 So.2d 253, clearly set forth that a surviving wife separated from her husband by a judicial separation a mensa et thoro is entitled to benefits under the Workmen’s Compensation Act (Act 20 of 1914, as amended, LSA-R.S. 23 :1021 et seq.) for the death of her husband suffered during the course of his employment, if she was dependent upon him for support from his earnings and was receiving such support at the time of his death.
 

 Presented for our determination herein is the question of fact of whether plaintiff, separated from Patrick Philip Farley by a judgment of separation a mensa et thoro, was dependent upon him for support from his earnings and was actually receiving $15 per week from him at the time of his fatal injury suffered during the course of his employment by Ryan Stevedoring Company, Inc.
 

 The evidence of record discloses that on May 23, 1949, the Juvenile Court for the Parish of Orleans awarded Frances Farley alimony in the sum of $15 per week for the support of herself and a minor child (Claire Rita Farley). At that time, Patrick Farley had departed from the matrimonial domicile and was occupying quarters in an outhouse located on the premises. During October, 1950, Mrs. Farley was granted a legal separation from her husband and awarded the care and custody of her minor child. The right to demand alimony for herself and her minor child was reserved in the judgment. No proceedings were ever taken to obtain such relief. In 1951, Mr. Farley moved from the grounds of the marital domicile. He left the occupancy of the main house and grounds — this community property located on Lizardi Street being allegedly tax exempt — to Mrs. Farley, demanding no rent from her. Shortly thereafter he took up residence with his sister, Mrs. Elizabeth F. Hughes,
 
 *1053
 
 at 1420 North Robertson Street. He was fatally injured on August 11, 1956 and died on the following day, August 12, 1956.
 

 Alleging that plaintiff and the deceased were husband and wife prior to and at the time of the accident, Frances Farley filed suit against Ryan Stevedoring Co., Inc. and its insurer, praying for compensation at the rate of $35 per week for 400 weeks. Defendants denied that plaintiff was dependent upon the earnings of the deceased for her support and prayed for the judgments of dismissal rendered in their favor.
 
 [2]
 

 In support of her claim, plaintiff acknowledged that she bore the burden of proof, Kilman v. Smith, La.App., 28 So.2d 499, and presented witnesses whose testimony in her behalf was to the effect that she was dependent upon the deceased and that the deceased had given her $15 weekly for her support.
 

 Jay Prejean, a son-in-law of Mrs. Farley who earned $76 per week, testified that he, his wife (a daughter of plaintiff and the deceased), and four children, lived rent-free with Mrs. Farley and had commenced such abode about one year prior to Mr. Farley’s death. He stated that he had made additions, which cost over $2000, to the house. With respect to Mrs. Farley’s income, his testimony is as follows:
 

 (Direct examination)
 

 «Q. * * * did Mrs. Farley have any source of income? A. Yes sir.
 

 “Q. What was her source of income? A. Mr. Farley gave her $15.00 a week, and that’s the only source of income she had at the time.
 

 “Q. I see. Did you ever give Mrs. Farley any money during that time? A. No. I couldn’t afford it. I had four children at the time.
 

 “Q. Did she have any other source of income, other than the $15.00 a week, Mr. Farley gave her? A. Not to my knowledge, sir.
 

 “Q. Were you ever present when Mr. Farley gave her $15.00? A. Well, I was there a couple of times, I mean, but if I was working, I mean, if I came in late * * * ”
 

 ( Cross-examination)
 

 "Q. How often did you see Mr. Farley come there? A. Well I didn’t see him very often.
 

 “Q. How often? A. Probably a couple of times, I would get home a little early and I would see — I would say probably twice I got home a little early.
 

 ******
 

 
 *1055
 
 “Q. Was that the time — or, on those two occasions, did you see him give Mrs. Farley $15.00? A. Yes sir.
 

 "Q. Did you see him give,her the money? A. Yes sir.
 

 “Q. Did you see him count it to her? A. No, he just handed her the money.
 

 “Q. How did you know it was $15.00? A. Because I saw it after he left. I saw her with the $15.00.
 

 “Q. She showed it to you after he l^ft? A, Yes sir. She didn-t exactly show it to me, but she said she got her $15.00.”
 

 With respect to the operation of the household, .Mr. Prejean testified that his wife bought groceries and Mrs. Farley bought groceries, there being no community fund; that he and his family and Mrs. Farley ate together. He also said that he paid the gas and electric bill.
 

 Mrs. Isabel Prejean testified:
 

 (Direct examination)
 

 “Q. * * * did your mother work during that time ? A. No sir.
 

 "Q. What was her source of income,' do you know ? A. Just what my daddy brought her.
 

 “Q. Did your daddy come and bring her money regularly? A. Yes sir.
 

 “Q. How regularly? A. Every week.’
 

 “Q. Did he come on any special day? A. Around the first of the week.
 

 if: sj: ;{: >}: í{í jj:
 

 “Q. And do you know how much money he gave your mother? A. Fifteen dollars.
 

 “Q. Were you ever present when he gave her $15.00? A. Yes, I was.
 

 “Q. Did anybody else contribute any money to the support of your mother? A. No.
 

 “Q. In other words, as far as you know, the $15.00 she got from your father was all the money she received? Is that correct? A. That’s it.
 

 “Q. You didn’t give her any money at all? A. No.
 

 "Q. Did your husband give her any money ? A. No sir.
 

 “Q. Did your sister give her any money? A. No sir.”
 

 ( Cross-examination)
 

 “Q. Did he [Mr. Farley] say anything to your mother when he gave her the fifteen dollars ? A. No sir.
 

 “Q.
 
 Would they talk about anything? A. No sir.
 

 “Q. He just came in, handed her $15.00 and went on about his business? A. He didn’t come in, because he didn’t like us. He was mad with us.
 

 * * * * * *
 

 
 *1057
 
 “Q. And no words were exchanged ? Did you go to the door with your mother? A. Once in a while, I would take the money.
 

 * * * * * *
 

 “Q. In the whole year, previous to your father’s death, how often did he give the money to you? A. About two or three times.”
 

 Mrs. Prejean corroborated the testimony of her husband. She said that a common household existed, there being no records kept of purchases for food. She stated that her mother spent the $15 weekly contribution from Mr. Farley for food, clothing and entertainment.
 

 Claire Rita Farley, a minor in 1949, testified that at the time her father died she was working for the Southern Bell Telephone and Telegraph Company and earning a gross salary of between $45 and $47 per week, her take home pay being approximately $60 every two weeks. She said that she lived with her mother and the Prej eans, and that her only contribution to the household expenses was payment of the telephone bill. She stated that she frequently ate away from home, and that she spent her salary on clothes, doctor bills, and other things she needed. She emphatically testified that she contributed no money toward her mother’s support, and that her mother had no source of income other than what her father was supposed to have given her.
 

 Mrs. Farley corroborated the testimony of Mr. and Mrs. Prejean. She also corroborated the testimony of Claire Rita Farley to the effect that she (Claire Rita) made no contribution toward her mother’s support. Mrs. Farley testified that she received $15 per week from her husband through the Juvenile Court up until 1951, and that after that time she consented to her husband’s bringing his weekly contribution to her. She stated that except for a few weeks her husband brought her $15 weekly, and that when he handed her the money he would say that he would see her the next week; that there was no conversation other than an exchange of greetings and solicitation as to health. She said that she kept no records of how she spent the money. With respect to her condition at the time of trial, Mrs. Farley stated that she had not attended a show in two years and that she had not asked any of her children for money even though she knew they would have acceded to such a request. She said that she could not buy any clothes, and that the last time she had received any money was the week before her husband was killed. She continued to live with the Prejeans, but had no money for groceries.
 

 Mrs. Elizabeth F. Hughes, a sister of the deceased (called by the defense), testified that her brother was living with her at the time of his death and had lived with her for approximately five years before the accident. She said that her brother was
 
 *1059
 
 ill during 1951, but that he returned to work in 1952. When asked whether she knew if her brother contributed towards the support of his wife, Mrs. Farley, she stated:
 

 (Direct examination)
 

 “I don’t know anything of that. No connection with that at all. I know he did send some money to the youngest girl by his oldest daughter, at times. I don’t know how many times.”
 

 Mrs. Hughes stated that she did not know whether her brother visited Mrs. Farley and the Prejeans. She said that Mr. Farley’s oldest daughter, Mrs. Charles Heck, told her that Mr. Farley gave her (Mrs. Heck) money for Claire Rita.
 
 [3]
 

 Charles Hoerske, Paymaster for Ryan Stevedoring Company, Inc. at the time of trial, while testifying as a witness for the defendants, stated that from August 11, 1955 to August 11, 1956 Mr. Farley received gross earnings of $2,026.02 and net earnings of $1,650.44. Mr. Hoerske also testified that Mr. Farley claimed himself as his sole exemption for withholding tax purposes. A photostatic copy of Mr. Farley’s Employee’s Withholding Exemption Certificate was filed in evidence. Mrs. Farley is not mentioned therein.
 

 The trial court did not assign written reasons for judgment. It merely stated in the judgment that the law and the evidence were in favor of the defendants. Therefore, we are not favored with its appreciation or evaluation of the evidence. The Court of Appeal stated [107 So.2d 828] :
 

 “The District Judge evidently did not believe this rather strange story of the wife which, to some extent, is corroborated by other members of the family.
 

 ík >k ík ‡ ‡ >k
 

 “Since the District Judge did not believe this evidence, our conclusion is that no such payments were being made. The evidence does not justify a reversal of the District Judge on this question of fact.”
 

 In view of the foregoing statements by the Court of Appeal and since there were no written reasons for judgment by the trial court, we granted the writ herein, and we shall now review the case with the same power and authority as if it had been carried directly by appeal to this Court. (Article VII, Section 11, Louisiana Constitution of 1921, supra.)
 

 Our appreciation of the evidence adduced by plaintiff, supra, is that it is of a positive nature and uncontradicted. No witness testified that Mrs. Farley did not receive $15 weekly from her husband. Witnesses for the plaintiff affirmatively
 
 *1061
 
 testified that she did receive $15 weekly from her husband, that she had no other means of support, and that she purchased groceries and clothing and paid for entertainment with this money.
 

 We are aware of the rales that a court is not obliged to accept the testimony of a witness even though it be uncontroverted (McIntire v. McBeath, La.App., 57 So.2d 707), and that mere possibilities and even unsupported probabilities are insufficient to support a judgment (Wilson v. Standard Accident Insurance Company, La.App., 92 So.2d 781), but we are also cognizant of the rule that to accept the theory of improbability, the improbability must be apparent (Johnson v. Tregle, La.App., 8 So.2d 755).
 

 In the instant matter, we see nothing improbable about a man’s having contributed to the support of his wife, who was separated from him by judgment of court, when his earnings justified the contribution.
 

 To find that Mr. Farley did not contribute to the support of Mrs. Farley would be to impute perjury to her and her witnesses. It is the accepted rule that courts will not impute perjury to apparently credible witnesses, particularly in the absence of any evidence in the record to indicate that the evidence is false or unreliable. Cockrell v. Penrod Drilling Co., 214 La. 951, 39 So.2d 429; Royal v. Kansas City Southern Railway Co., La.App., 75 So.2d 705; Tate v. Gullett Gin Company & Liberty Mutual Ins. Co., La.App., 86 So. 2d 698.
 

 The fact that Mr. Farley did not mention his wife’s name in his Employee’s Withholding Exemption Certificate is not conclusive evidence that she was not receiving money from him and was not dependent upon him for support, particularly in view of the following testimony of Mr. Hoerske as a witness for the defendants :
 

 “Q. Now, with regard to the Withholding statement produced in Court, Mr. Farley claimed himself as his sole exemption. Is that correct? A. According to the record.
 

 “Q. And, according to the United States Revenue Code, that is all he is entitled to take, isn’t that so, unless he has a dependent living with him in the same house? Isn’t that correct? A. Well, that is, some of these boys, they don’t put down what they are supposed to put down. They will have four or five, and they will put down two. We’ve got many of them will put down four, five or six, and as a result, they get back four or five hundred dollars a year from this, but we can’t control what they put down.”
 

 Under the circumstances of this case, we conclude that the uncontradicted positive testimony of plaintiff and her witnesses — although they be interested parties
 
 *1063
 
 —must be accepted as true. Tolle v. Higgins Industries, Inc., 212 La. 173, 31 So.2d 730; White v. Calcasieu Paper Company, Inc., La.App., 96 So.2d 621; Fee v. Calcasieu Paper Co., Inc., La.App., 89 So.2d 434; Coleman v. Manufacturers Casualty Insurance Company, 229 La. 105, 85 So.2d 47; Ehtor v. Parish, La.App., 86 So.2d 543; Marks v. New Orleans Cold Storage Co., 107 La. 172, 31 So. 671, 57 L.R.A. 271; Woldert Co., Inc. v. Joe Samuel Co., Inc., 1 La.App. 251.
 

 Having concluded that Mrs. Farley was receiving a weekly contribution of $15 from her husband at the time of his death, we find that she was dependent upon his earnings, supra, for support, and Workmen’s Compensation Benefits accrue to her because of his fatal injury during the scope of his employment.
 

 Lastly, we must determine the amount of weekly compensation plaintiff shall .receive.
 

 During the trial, after argument on an objection to a question regarding the gross earnings of Patrick Farley from August 11, 1955 to August 11, 1956, the trial judge stated:
 

 “I am only asking what possible distinction there could be.”
 

 To the above statement, counsel for the defendants replied:
 

 “To establish the amount of contribution, if any, that would be due to Mrs. Farley, to be based oh a percentage, or proportionate amount of his earnings. There is a formula, which I have never been able to work, but it is in the decisions somewhere.”
 

 LSA-R.S. 23:1231 provides:
 

 “For injury causing death within two years after the accident there shall be paid to the legal dependent of the employee, actually and wholly dependent upon his earnings for support at the time of the accident and death, a weekly sum as hereinafter provided, for a period of four hundred weeks.”
 

 LSA-R.S. 23:1232 sets forth:
 

 “Payment to dependents shall be computed and divided among them on the following basis:
 

 “(1) If the widow or widower alone, thirty-two and one-half per centum of wages.”
 

 LSA-R.S. 23:1202 provides:
 

 “The maximum compensation to be' paid under this Chapter shall be thirty-five dollars per week and the minimum compensation shall be ten dollars per week; * * * ”
 

 LSA-R.S. 23:1021(11) provides:
 

 “ ‘Wages’ means the daily rate of pay at which the service rendered by the injured employee is recompensed under the contract of hiring in force at the time of the injury.”
 

 
 *1065
 
 Incorporated in the evidence of record is a tabulation of the deceased’s earnings ■over the period August 16, 1955 through August 11, 1956. These facts were attested to by Charles Hoerske, supra. Gross earnings amounted to $2,026.02; net earnings or take home pay totalled $1,650.44. A total of approximately ninety-one days were worked. The highest amount paid for one week’s work was $100.47; the lowest amount was $3.78. Mr. Hoerske’s testimony, while testifying as a witness for plaintiff, is as follows:
 

 “Q. Mr. Hoerske, will you tell the Court whether or not you know what Mr. Farley’s wages were on August 11, 1956?
 

 “A.
 
 Two dollars, fifty cents an hour is what the gentleman made, and he made as many hours as he worked. That’s what he made, plus over eight hours on tour, over-time. Whatever the longshore contract stipulated. It was time-and-a-half, and then they had special rates for special cargo, and things like that.
 

 “Q. Now, Mr. Farley worked when he had work?
 

 “A. That’s right. He was a member of the Local, the Longshoreman’s Local of the ILA, and if we had the work, he worked for us, maybe Lykes Brothers, Strachan Line, Mississippi, whatever company had the work that day. He went to the Shape-up on Canal Street, and the usual procedure is, the Union makes all the stevedoring and steamship companies abide by it, according to the Union Contract.”
 
 [4]
 

 In Rylander v. T. Smith & Son, 177 La. 716, 149 So. 434, speaking of the amendments to the Workmen’s Compensation Statute, we said:
 

 “ * * * It is therefore clear that these two amendments worked, and were manifestly intended to work, a radical change in the law. Henceforth the rate of compensation allowed the injured workman was no longer to be based upon his ‘average weekly wages’ but upon his ‘daily rate of pay’ ; and the fact that the compensation was still to be paid weekly and for a certain number of weeks instead of daily or yearly for a certain number of days or years has no bearing on the quantum of compensation to be paid, but only on the method of payment and the length of time during which compensation shall be paid.”
 

 In the Rylander case, supra, this Court held that, despite the fact that longshoremen’s work was scarce and that plaintiff’s total earnings for several months prior to
 
 *1067
 
 the time of trial had not averaged more than $5.20 per week, the equivalent of one full eight hour day, “it would be doing violence to the plain intent of the lawmaker to revert to the ‘average weekly wages’ as the standard for computing the rate of compensation instead of adhering to the plain words of the statute and fixing the compensation on the basis of the ‘daily rate of pay.’ ” See, also, Clifton v. Arnold, La.App., 87 So.2d 386.
 

 Mr. Hoerske’s testimony, to the effect that Mr. Farley earned $2.50 an hour and that a normal working day was composed of eight hours, is neither contradicted nor disputed. No contention is made that overtime should be averaged into the daily wage. Applying the rule set forth in the Rylander case, supra, we find that Mr. Farley’s daily wage was $20 (eight hours at $2.50 per hour). Since longshoremen have no set time to work and are employed when their services are required, we conclude that an employee of this trade could work a six day week. Jarrell v. Travelers Ins. Co., 218 La. 531, 50 So.2d 22; Carrington v. Consolidated Underwriters, 230 La. 939, 89 So.2d 399; Colquette v. La. Central Lumber Co., 11 La.App. 140, 119 So. 714. Therefore, Mr. Farley’s weekly wage was $120.00 (six times his daily wage of $20.00).
 

 The Workmen’s Compensation Law, supra, provides that plaintiff is entitled to 32i/¿% of the deceased’s weekly wage, but that such amount shall not exceed $35. Herein,
 
 321/2%
 
 of $120 would amount to^ $39. Mrs. Farley’s benefits, therefore, will amount to $35 per week.
 

 A review of the record convinces us that neither the employer nor the insurer has acted in an arbitrary or capricious manner in refusing to pay Mrs. Farley workmen’s compensation. Therefore, plaintiff is not entitled to the penalties demanded.
 

 In petition, plaintiff demanded funeral and medical expenses incurred for her deceased husband. While testifying, she stated that these expenses had been paid and that her demand was reduced to Workmen’s Compensation Benefits.
 

 For the reasons assigned, the judgments of the District Court and the Court of Appeal are reversed and set aside.
 

 It Is Now Ordered, Adjudged And Decreed That there be judgment in favor of Frances Fourcade, Widow of Patrick Philip Farley, and against Ryan Stevedoring Company, Inc. and American Mutual Liability Insurance Company, in solido, for compensation at the rate of $35 per week beginning August 18, 1956 and continuing for 400 weeks with interest at the rate of 5% per annum on each past due payment from its due date until paid. It is further ordered that all accrued amounts with interest from the due date of each until paid shall be paid in a lump sum.
 

 
 *1069
 
 It Is Further Ordered, Adjudged And Decreed That plaintiff’s attorneys shall receive fees for their services in an amount not to exceed 20% of this award,-provided that the maximum fee shall not exceed $1,-000, to be deducted from the payments due under the compensation award herein.
 

 All costs are to be paid by defendants.
 

 [1]
 

 . 107 So.2d 825.
 

 [2]
 

 . Defendants admitted the accident and injury, death, notification, and hazardous employment, and that no compensation was paid. They averred that they paid funeral expenses as well as medical expenses.
 

 [3]
 

 . Mrs. Heck was not called as a witness by tlie defendants. Mrs. Farley testified that Mrs. Heck never gave Claire Rita any money. Claire Rita was not questioned on this subject.
 

 [4]
 

 . In other testimony,
 
 Mr.
 
 Hoerske stated that the deceased earned $2.52 per hour. For the purpose of this decision, we will employ the round figure of $2.50 per hour.