536 So.2d 1261 (1988)
Roosevelt CEASOR, Plaintiff-Appellant,
v.
BELDEN CORPORATION and Liberty Mutual Insurance Company, Defendants-Appellees.
No. 87-646.
Court of Appeal of Louisiana, Third Circuit.
August 18, 1988.
On Rehearing January 17, 1989.
Broussard, Bolton, Halcomb & Vizzier, Daniel E. Broussard, Jr., Alexandria, for plaintiff-appellant.
Gaharan & Wilson, Joseph Wilson, Jena, for defendants-appellees.
Before STOKER, DOUCET and KING, JJ.
*1262 KING, Judge.
The sole issue presented is whether or not the trial court was correct in denying worker's compensation benefits, penalties and attorney's fees to plaintiff.
Roosevelt Ceasor (hereinafter plaintiff) was employed by Belden Corporation (hereinafter defendant) as a wire stranding operator on the date of his alleged injury. Plaintiff claims that a reel of wire, weighing 490 pounds, fell on his right foot, causing injuries. Plaintiff's right foot became infected and failed to respond to antibiotic treatments and heat soaks. Eventually, plaintiff's right foot and leg became infected with gangrene and were amputated. Plaintiff filed a claim for workman's compensation benefits which was denied. Thereafter, plaintiff filed suit against defendant and its insurer, Liberty Mutual Insurance Company. The trial court found that plaintiff failed to prove that an injury occurred at work and that plaintiff failed to prove that the amputation was causally related to the injury even if it occurred at work. Plaintiff timely appeals. We reverse and render judgment.

FACTS
Plaintiff was employed by defendant as a wire strand operator on June 13, 1984, the date of the alleged injury. Plaintiff, who was 45 years old, had been employed by defendant for six years. As a wire strand operator, plaintiff was required to operate four stranding machines each pulling individual wires from separate spools and stranding them together to form a single heavy gauge stranded wire. As the individual spools ran out, plaintiff was required to stop the machine and solder the end of the single wire on the empty spool to the beginning end of a single wire on a new spool. Each stranding machine utilized several separate spools of wire, depending upon the gauge of finished stranded wire needed. As plaintiff was required to watch and operate four stranding machines, he was further required to watch as many as 40 individual spools of wire. Stranding operators were not allowed to let a separate spool of single wire run empty as this would change the gauge of the stranded wire being produced.
When a reel of stranded wire was completed and full, the stranding machine was turned off and opened. A hoist was maneuvered overhead and the 490 pound reel of finished stranded wire was removed from the stranding machine and lowered to the ground. Before the reel could be tagged and wrapped, several feet of the stranded wire had to be stripped off the reel to look for broken ends of the individual wires making up the strand. In order to accomplish this, some employees would lean the spool of completed stranded wire against another reel or against a nearby stranding machine.
Plaintiff testified at trial to the following events. On the day of the alleged accident he leaned a reel of completed stranded wire against another reel to strip it of any broken wires. As he was stripping the reel, he noticed a spool of single strand wire emptying on a nearby stranding machine. Plaintiff stated that he moved to check the spool and disturbed the leaning reel, causing it to fall on his right foot, crushing his steel toed boot. Plaintiff stated he fell backwards on his rear and stopped the fall by using his hands. He stated another employee, Jimmy Bowman, came over to plaintiff's working area immediately after the accident and saw the reel on its side. Plaintiff stated he told Bowman of the accident at that time and then returned to the stranding operation. Bowman substantiated these events at trial.
Plaintiff testified that soon after the accident, his right foot began to tingle and later began to burn. He left the work area and went into a supervisor's office to spray his foot with instant ice spray from a first aid kit. At approximately 2:00 P.M., Martha Greer, the acting supervisor, asked plaintiff to work overtime the following day, June 14, 1984. Plaintiff stated that he agreed to the overtime work only after notifying Greer of the accident and indicating that his foot was hurting and needed the attention of a doctor. Plaintiff left work at 5:00 P.M. on Wednesday, June 13th and once at home, he told his wife of *1263 the accident and soaked his foot in ice water. While plaintiff was soaking his foot, Willie Curry, a neighbor, came by to visit. After seeing plaintiff's swollen foot, he offered to have his wife, JoAnn, who was an L.P.N., come and treat his foot with betadyne antibiotic solution. Plaintiff did not remember what day JoAnn came by, but does remember getting the betadyne solution and soaking his foot. Plaintiff returned to work the following day and worked the additional overtime he had agreed to work.
Plaintiff stated he went to Dr. William C. Coney, a general practitioner in Jonesville, Louisiana, on Thursday, June 14th, after he got off work. However, the doctor was out of the office and not expected back until the following day. Plaintiff returned on Friday, June 15th, and the doctor was again out of the office. Over the weekend, plaintiff was treated by JoAnn Curry on Saturday and Sunday. Plaintiff did not receive an examination until Monday, June 18th, when Dr. Coney admitted him to Catahoula Parish Hospital because his foot was in a gangrenous state and grossly infected with a purulent drainage from the second toe. The second toe was later diagnosed as having gangrene and conservative treatment of heat soaks and antibiotics were begun immediately. On July 27th, when the conservative treatment failed to bring about improvements, Dr. Charles W. Roberts, a general surgeon, amputated plaintiff's right leg from the knee down. Plaintiff was later fitted with an artificial leg prosthesis.
Both Dr. Coney and Dr. Roberts testified in their depositions that plaintiff, as a diabetic, was more prone to suffer from infections, took longer to heal, and that he would have a decreased sense of touch in his extremities. Both doctors also testified that they had no reason to believe that the injury and trauma the plaintiff sustained did not take place as the plaintiff stated it had. Their observations of the plaintiff's foot were consistent with the history of the injury as given by plaintiff.
Dr. Coney stated that on Monday, June 18, 1984 when he saw plaintiff, that his second toe of the right foot had sustained trauma. This was in addition to the entire foot being grossly infected. Dr. Coney was specific in stating, "the second toe looked like it had the brunt of the trauma to it...." When asked if he saw a lesion, he replied, "It was just a totally infected smelly open area. I didn't write down on his chart the exact location of the lesion."
Dr. Roberts also spoke in favor of the possibility of plaintiff's accident occurring as plaintiff had reported it. When asked his opinion about the causal connection between the alleged accident and plaintiff's injury, Dr. Roberts answered as follows:
"Q. Doctor, assuming that Mr. Ceasor had had a trauma to his right foot on June 13, 1984, and that his, a reel either smashed or fell on his foot, a reel of wire, and insulted or caused trauma to his foot, assuming that fact to be true, in your opinion, could that accident have brought about or precipitated the condition that you found when you first examined Mr. Ceasor?
A. Yes, sir, it could have.
Q. In fact, in your opinion, if that, in fact, did occur, is that your opinion as to what brought about the condition that you found?
A. Well, as previously explained, under usual circumstances, a person that has an injury that does not have diabetes will heal much easier or much sooner than a diabetic, because the diabetic has in-vessel disease and this oftentimes prevents healing to occur that would've normally occurred, and I certainly have to say that diabetes played an important role in the man ending up losing his foot and his leg.
Q. And also the diabetes, coupled with the trauma that he had on his foot, is that correct?
A. Beg your pardon?
Q. The diabetes coupled with the trauma that he sustained ...
A. Yes, he had an insult and the insult was the trauma, and then his diabetes prevented his body from reacting *1264 in as efficiently as it normally would if he were healthy."
Both doctors concurred there were other sources of injury that could have possibly caused plaintiff's initial infection such as an ingrown toenail, or a blister, however, their initial opinion was that the injury occurred as plaintiff had reported it to them.
Dr. Roberts was specifically asked about the osteomyelitis the plaintiff was diagnosed as having in the bones of his right foot and the earliest possible date that it could have begun, and yet appear as it was on the date of the June 18, 1984 X-ray, and said:
"Q. Now, I meant to ask you about the osteomyelitis. That's the infection of the bony tissue?
A. That's true ...
Q. Not the bony tissue, but the bone?
A. It's true that that's an infection of the bone.
Q. Does that develop rapidly or does that take a while?
A. Takes a few days.
Q. How many days is a few days? Two weeks? A week? Three weeks, or can you say that ...
A. Usually a week or so.
Q. When he was, you said that the x-rays taken on his admission indicated that he had osteomyelitis at that time?
A. The x-ray dated the 18th of June states that he had involvement which indicated osteomyelitis.
Q. So you would think that the infection would've had to start around the 11th, or about a week before, or would it be more than ...
A. It would have been at least, usually a week or so before you get any changes.
* * * * * *
Q. Is there any way that you could tell from the conditions that you saw on June 26th how long this had been an ongoing process, how many, had it been two weeks, had it been three weeks, been a week? I assume it's not like, well, something you can measure, but from your experience?
A. Well, the thing about it is, I mean you know, you know the infection was going on because he had some evidence of x-ray changes, but you know, as far as me to be able to set down and look backward and tell you exactly how many days, I can't." (Emphasis added.)
Martha Greer, the acting supervisor of the defendant's plant on the date of the incident, testified at trial that she did remember seeing plaintiff in the supervisor's office, with his boot off, spraying one of his feet with first aid ice spray. She stated the ice spray was kept in the first aid kit specifically for cuts and bruises. While testifying that she did not remember plaintiff telling her of the accident, when she asked him to work overtime, she stated that she did not inquire why plaintiff was earlier spraying his foot in the office. When asked under direct examination about her ability to hear all that was said in the noisy Belden plant with her ear plugs in, she responded that she could hear, "most of the time." Glen Evans, the absent supervisor whom Greer had temporarily replaced, testified that Martha Greer was probably never formally instructed as to what to do in the event of an injury. He stated that it was not proper procedure for a stranding operator to lean a finished reel of wire against another as it was dangerous. Greer, on the other hand, stated she frequently saw operators lean the reels in this fashion. The video tape prepared for trial and submitted into evidence, which showed the stranding operation, showed an operator leaning finished reels in this allegedly prohibited fashion.
The parties stipulated the rate of compensation, amount of medical expenses, coverage by defendant, Liberty Mutual, and entitlement to credits by defendant, Belden, in the event judgment was rendered on plaintiff's claim.
At the conclusion of trial, the trial judge initially requested a further medical examination *1265 by an orthopedist to obtain additional evidence. After strong opposition from plaintiff's attorney, that any further evidence would only benefit the defendants, the trial judge rendered judgment, without the additional medical examination, in favor of defendant and against plaintiff rejecting his claims.

LAW
In his reasons for judgment, the trial judge cited Crochet v. American Tobacco Co., 407 So.2d 1330 (La.App. 3 Cir.1981) as the standard for the burden of proof a worker's compensation claimant must prove at trial to be granted benefits. This court stated in Crochet, at page 1333, as follows:
"`It is settled jurisprudence that the workmen's compensation claimant has the burden of proving by a preponderance of the evidence that his disability is causally related to an accident that occurred during the course and scope of his employment. Prim v. City of Shreveport, 297 So.2d 421 (La.1974). The testimony of a claimant alone may be sufficient to prove the occurrence of a work-related accident, if such testimony is plausible, consistent, and is supported by other circumstances appearing from the record. However, where the plaintiff's testimony is the sole evidence, it must be clear and convincing.' See Soileau v. Bituminous Casualty Corp., 348 So.2d 1313 (La.App. 3rd Cir.1977). (Emphasis supplied.)"
The trial judge, having cited this jurisprudence setting forth the standard of proof required, thereafter delineated his evaluation of the testimony and evidence and concludedthat the plaintiff failed to meet his burden of proof by clear and convincing evidence.
As plaintiff's testimony was not the sole evidence but was supported by other evidence and testimony, plaintiff was relieved of the clear and convincing burden of proof and must only prove by a preponderance of evidence that his injury occurred during work to support an award of compensation. Guillory v. State, 486 So.2d 1195 (La.App. 3 Cir.1986); Leinweber v. Chevron Chem., Oronite Add. Div., 427 So.2d 887 (La.App. 4 Cir.1983); Crochet, supra. Thus, in order to reverse, this court must find that the plaintiff proved by a preponderance of the evidence that the accident which caused his injury occurred as plaintiff claimed and that the trial court decision is clearly erroneous in light of the evidence presented at trial.
In his written reasons for judgment the trial judge found the following facts in favor of plaintiff's claim:
(1) Plaintiff reported the accident to a co-worker, his relatives, and to medical personnel;
(2) The evidence indicated the procedures at the Belden Plant could cause such an injury;
(3) Plaintiff was seen by a supervisor spraying first aid spray on his foot after the alleged accident;
(4) Plaintiff produced a right steel toed boot into evidence with a visible crack in the steel toe portion over the second toe (next to the large toe);
(5) Plaintiff showed that the gangrene and osteomyelitis and subsequent amputation could have been caused by the type of injury described by him;
(6) Plaintiff did state that he told a supervisor of the accident but did so while nearby machinery was noisily operating;
(7) Dr. Coney, the treating physician, was of the opinion that the foot, and particularly the second toe, had suffered some type of trauma; and
(8) The medical evidence also clearly established that plaintiff suffered from diabetes and that he therefore was very vulnerable to infections in the extremities, particularly the foot.
Also set forth in the reasons for judgment were the following findings of fact against the plaintiff's claim:
(1) The supervisor, Martha Greer, stated plaintiff did not tell her of the accident;
(2) Mrs. Greer, although stating she did see plaintiff spraying his foot, thought nothing of the occurrence as *1266 plaintiff had complained of foot aches before;
(3) There were no witnesses to the accident;
(4) There are other possible ways the plaintiff's foot could have become infected; and
(5) Dr. Roberts, the surgeon, stated that it would have taken a week or so for the bones of the foot to be in the condition shown in the X-rays of June 18th.
While there are genuine issues of dispute such as plaintiff's claim that he told his supervisor, Mrs. Greer, of the accident and her denial of it, and the possibility that plaintiff's injury could have occurred in another fashion, we find that there was sufficient evidence presented at trial by the plaintiff to prove by a preponderance of the evidence that the injury did occur at work as he testified.
In West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979), the Louisiana Supreme Court discussed the issues of uncontradicted testimony of the plaintiff-claimant regarding the accident and of the scope of appellate review in cases where the trial court denies plaintiff's claim without substantial reasoning. In West, the plaintiff, a nurses aide allegedly injured at work while lifting a patient, filed a claim for benefits under the total disability provision and was denied recovery. There, as in the case before this court, the trial court gave its reasons for judgment. In particular, the trial judge stated that plaintiff had prior back problems and did not report the incident to her supervisor immediately after her injury. These findings are quite similar to those made in the present case, i.e., plaintiff, Roosevelt Ceasor, might have had a prior foot ailment and failed to notify his supervisor.
In West, supra, at page 1147, the Supreme Court stated the following which we find pertinent and decisive in the present case:
"In evaluating the evidence, the trier of fact should accept as true the uncontradicted testimony of a witness, even though the witness is a party, at least in the absence of circumstances in the record casting suspicion on the reliability of this testimony. Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967); Farley v. Ryan Stevedoring Co., 238 La. 1048, 117 So.2d 587 (1960); Bonanno v. Decedue, 186 La. 1041, 173 So. 756 (1937). * * * (In each of these instances, the trial court's finding of fact was reversed due to its failure to observe this principle.)"
In the present case there was no contradictory testimony that plaintiff's accident did not or could not occur as he reported it to have happened. Defendant argues that a lack of witnesses weakens plaintiff's claim of an accident. It is apparent both in the video tape and the photographs admitted at trial that the layout of the Belden plant does not allow for an employee to see all of what another employee does while on the job. Jimmy Bowman, a co-worker, did testify at trial that as he walked by plaintiff's area, there was a reel of wire lying on its side and that plaintiff then told him that it had just fallen on his right foot. Defendant could not produce a single witness to testify that the reel had not fallen on plaintiff's foot or that the alleged accident did not happen as plaintiff claimed it did.
The medical testimony also clearly supports plaintiff's claim that the reel fell on his foot. However, the trial judge seemed to disregard the majority of Dr. Roberts' testimony relative to the length of time it would take for plaintiff's foot and leg to develop symptoms of osteomyelitis. Dr. Roberts answered this question by variously stating, "Takes a few days," "usually a week or so," and then, specifically stated that he could not say exactly how many days it would take for the symptoms to develop. Yet the trial judge selected the "usually a week or so" and concluded that working backwards in time from Monday, June 18th, that plaintiff's injury must have occurred sometime on June 11th, a week earlier, and two days before the date that plaintiff alleged the accident occurred. This is clearly contrary to Dr. Roberts' testimony that he could not specifically state the number of days necessary for these symptoms to develop.
*1267 Above all, the testimony of the plaintiff is credible and seems to have been much ignored at trial. Terry Copeland, the personnel manager at Belden, testified that he had never had any credibility problems with plaintiff or his wife, another Belden employee. Unlike the plaintiff in Crochet, supra, who admitted that he had altered company records and filed false business reports, which clearly cast doubt on his credibility, the plaintiff in the case at hand proved to be a reliable, credible witness. In fact this was never an issue at trial.
In reviewing the evidence before this court we find that the plaintiff did, by a preponderance of the evidence, carry his burden of proving an injury by accident occurring at work and thus is entitled to recover worker's compensation benefits. Long v. Moses Motor Hotel, 460 So.2d 1156 (La.App. 2 Cir.1984). We see no other way the plaintiff could have presented his case considering the circumstances in which he found himself. The broken steel toed boot, the video, photographs, and lay and medical testimony, all bolster and support plaintiff's claim that on June 13, 1984, while in the course of operating a stranding machine, a 490 pound reel of stranded wire fell, crushing his boot and injuring his right foot, ultimately leading to the amputation of plaintiff's right lower leg. Pre-existing disease or infirmity of the employee does not disqualify a claim if the work-related injury combined with the disease to produce disability for which compensation is claimed. Allen v. Louisiana-Pacific Corp., 512 So.2d 556 (La.App. 3 Cir.1987), and cases cited therein.
In considering the evidence as a whole and in particular in reviewing the trial judge's reasons for judgment, we find no reason for the trial court not to have accepted the testimony of the plaintiff. The Supreme Court, in reversing both the Court of Appeal and the trial court in West v. Bayou Vista Manor, Inc., supra, stated the following at page 1150:
"It is true that `the reviewing court must give great weight to the factual conclusions arrived at by the trier of fact, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may feel that its own evaluation and inferences are as reasonable.' Cadiere v. West Gibson Products Company, 364 So.2d 998, 999 (La.1978) (Italics ours). However, the appellate court is not required by this principle to affirm the trier of fact's refusal to accept as credible uncontradicted testimony (Johnson, cited below), or greatly preponderant objectively-corroborated testimony (Arceneaux, cited below) where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Johnson v. Travelers Insurance Co., 284 So.2d 888 (La.1973)." (Emphasis added.)
The reasons given by the trial judge do not adequately support his rejection of plaintiff's testimony nor do they cast any doubt on plaintiff's credibility, and are clearly contrary to the cited jurisprudence. For these reasons we find the trial judge was clearly in error in finding plaintiff did not meet his burden of proof.

PENALTIES AND ATTORNEY'S FEES
The issue of whether the refusal to pay medical expenses is arbitrary and capricious is a factual one. Penalties are due when the expenses are not paid within sixty days after receipt of proof of loss. Allor v. Belden Corp., 382 So.2d 206 (La. App. 3 Cir.1980), modified in part, 393 So. 2d 1233 (La.1981). If an employer has a bona fide dispute as to whether the injury is compensable or not, penalties will be denied. Even though we reverse and grant benefits to plaintiff, we do find there was sufficient dispute, at least initially, to refuse such payments. Therefore, we deny plaintiff's request for attorney's fees and penalties.

DECREE
For the reasons set forth, we reverse the judgment of the trial court and render judgment in favor of plaintiff, Roosevelt Ceasor, and against the defendants, Belden Corporation, and its insurer, Liberty Mutual Insurance Company, awarding plaintiff *1268 worker's compensation benefits in the amount of $211.25 per week from June 13, 1984, together with judicial interest from the date each payment is due, until paid. Judgment is further rendered in favor of plaintiff and against defendants for medical expenses in the sum of $20,396.92. Judgment is further rendered in favor of defendant, Belden Corporation, giving it credit for the sum of $90.00 a week for 12.7 weeks, for payments to plaintiff under defendant, Belden Corporation's, accident and sickness disability benefits plan, and for the sum of $18,765.32 for payments made to plaintiff under defendant, Belden Corporation's, hospitalization plan, and for Social Security Benefits paid to plaintiff in the sum of $552.00 per month from January, 1985 and shall be entitled to such credit as long as Social Security Benefits are paid. Judgment is further rendered in favor of defendants and against plaintiff rejecting his demand for penalties and attorney's fees. The defendants-appellees are taxed with all costs of the trial and appeal.
REVERSED AND RENDERED.

ON REHEARING
PER CURIAM.
Following our decision on original hearing of this appeal all parties timely applied for a rehearing. We granted both applications and the matter was again permitted to be briefed and orally argued.
In its application for rehearing defendants-appellees contest the reversal of the trial court judgment and alternatively seek clarification of whether or not the judgment of this Court awards plaintiff-appellant benefits for total permanent disability or for temporary total disability. In his application for rehearing plaintiff-appellant contests the portion of the judgment of this Court awarding defendants-appellants a reduction in the worker's compensation benefits granted to him by the amount of the Social Security disability benefits being paid to him, in accordance with La.R.S. 23:1225 which allows such reduction in benefits paid for permanent total disability, taking the position that the judgment of this Court only awarded temporary total disability benefits and not total permanent disability benefits. Alternatively, plaintiff-appellant contests the amount of the reduction on the basis that no evidence was offered by defendants-appellants pertaining to calculation of the amount of offset between the Social Security disability benefits being paid and the worker's compensation benefits due.
After again reviewing the entire record, all briefs, and after again hearing argument of counsel, we find that our decision awarding plaintiff-appellant worker's compensation benefits for injury sustained in the course and scope of employment is correct.
We find merit in defendants-appellees' argument that, according to the evidence presented at trial, plaintiff-appellant is not totally permanently disabled within the meaning of our present worker's compensation law. As the Court stated in Pool v. G.N. Batteries, Inc., 480 So.2d 898 (La. App. 2 Cir.1985):
"Act No. 1 of the Extraordinary Session of 1983 (effective July 1, 1983) effected significant changes in the definition of total permanent disability, making much more restrictive those situations in which the term applies. When the employee is not working, such benefits may be awarded only if he proves by clear and convincing evidence, unaided by any presumption of disability, that he is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in pain, notwithstanding its location of availability. La. R.S. 23:1221(2)(c).
Further, no judgment of total permanent disability may be entered prior to an evaluation of rehabilitation possibilities or during a rehabilitation program. La. R.S. 23:1226(D); 1221(2)(e); 1226(G). In the latter instance the worker is entitled to temporary total disability benefits for the duration of the program. La.R.S. 23:1226(F)."
In the case at bar, the medical evidence and lay testimony clearly established that plaintiff-appellant *1269 was totally disabled at the time of trial, but the record contains no evidence of evaluation of rehabilitation possibilities. For this reason we cannot say that plaintiff-appellant is totally permanently disabled. Consequently, we amend our judgment to clarify that plaintiff-appellant is temporarily totally disabled and to eliminate reduction of plaintiff-appellant's worker's compensation benefits by the amount of Social Security disability benefits presently being paid to him. Our decree in this matter is amended to read as follows:

"DECREE
For the reasons set forth, we reverse the judgment of the trial court and render judgment in favor of plaintiff, Roosevelt Ceasor, and against the defendants, Belden Corporation, and its insurer, Liberty Mutual Insurance Company, awarding plaintiff worker's compensation benefits for temporary total disability in the amount of $211.25 per week from June 13, 1984, together with judicial interest from the date each payment is due, until paid. Judgment is further rendered in favor of plaintiff and against defendants for medical expenses in the sum of $20,396.92. Judgment is further rendered in favor of defendant, Belden Corporation, giving a credit for the sum of $90.00 a week for 12.7 weeks, for payments to plaintiff under defendant, Belden Corporation's, accident and sickness disability benefits plan, and for the sum of $18,755.32 for payments made to plaintiff under defendant, Belden Corporation's, hospitalization plan. Judgment is further rendered in favor of defendants and against plaintiff rejecting his demand for penalties and attorney's fees. The defendants-appellees are taxed with all costs of the trial and appeal."
In all other respects the applications for rehearing filed by plaintiff-appellant and defendants-appellees are denied.