625 So.2d 335 (1993)
Rickey RICHARD, Plaintiff-Appellant,
v.
TEMPLE-INLAND, Defendant-Appellee.
No. 93-165.
Court of Appeal of Louisiana, Third Circuit.
October 6, 1993.
*336 Larry B. Minton, Alexandria, for Rickey Richard.
Charles V. Musso Jr., Lake Charles, for Temple-Inland.
Before STOKER, LABORDE and YELVERTON, JJ.
STOKER, Judge.
In this case we reverse the administrative hearing officer's finding that plaintiff sustained no on the job injury entitling him to worker's compensation. We reverse because the hearing officer failed to follow proper legal principles.
The hearing officer wrote no reasons for judgment but indicated in his judgment that he found that plaintiff failed to prove that an accident occurred based on his conclusion that plaintiff was not a credible witness. From our review of the record we find that plaintiff's testimony that he injured himself in an accident while in defendant's employment was really not contradicted. We conclude that the hearing officer failed to follow the legal principles governing the required proof in such circumstances as laid down in West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979) and Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992). Accordingly, we reverse and remand the case for further proceedings.
Rickey Richard filed this workers' compensation claim against his employer, Temple-Inland, contending that on October 8, 1990, he injured his back in the course and scope of his employment when he was attempting to unstack and uncross wood on a conveyor belt near the station where he was working. The administrative hearing officer denied the claim, stating in part in his judgment:
"Claimant failed to prove that a compensable accident occurred as alleged on October 8, 1990. He simply lacked credibility. For example, on the Report of Accident (Exhibit D-7), claimant listed Wilson Chapman as a witness to the accident. At trial, Mr. Chapman denied any knowledge of an accident. The record is full of other examples of false statements made by the claimant, like the incorrect medical information he gave to Dr. Georgiades (Exhibit D-4). Furthermore, at the time of the accident, claimant was on the verge of being fired (See, Exhibit D-5, under Finding of Fact). The Court believes that if claimant's back condition is such that he should not perform the pre-injury duties, it is a result of a condition that pre-existed the date of the alleged injury."
From the judgment in favor of defendant, Richard appeals.

BACKGROUND
Prior to his employment with defendant, plaintiff worked for Harkin Marketing Company from November 1988 until April 27, 1990. In September 1989, while working for Harkin, plaintiff apparently injured his lower back unloading barrels of oil. Dr. Richard Kibler, chiropractor, treated plaintiff for this injury from September 25, 1989, until February 26, 1990, at which time plaintiff's file was marked "released, maximum medical chiropractic improvement." During the time of his injury and treatment, plaintiff continued to work, and Harkin Marketing Co. paid his medical bills.
Also prior to his employment with defendant, on March 1, 1990, plaintiff was involved in an automobile accident. Plaintiff returned to Dr. Kibler for treatment. Dr. Kibler testified that he examined plaintiff on March 2, 1990, and found that plaintiff had problems in his cervical spine and low back. Dr. Kibler testified that plaintiff was still under his care *337 for this injury at the time of the alleged accident giving rise to this suit.
Plaintiff began working for defendant on April 27, 1990, as a lumber separator. Apparently, this job included manually moving lumber, at least occasionally, if it crossed or jammed after coming out of the board edger and gang saw.
On October 8, 1990, plaintiff went to work at 3:30 p.m. for the 3:30 p.m. to 12:00 a.m. shift. Plaintiff testified that he and Wilson Chapman, the trimming operator, were working together. According to plaintiff, a little after 4:00 p.m. their first jam up occurred. Plaintiff and Chapman unjammed the lumber on the transfer deck and started again. There was another jam up within a few minutes. Plaintiff stated that after unjamming the lumber for the second time, he noticed a little pain in the lower part of his back. A third jam up occurred a little after 5:00 p.m. Plaintiff testified that after unjamming the lumber and starting up again, he noticed he was really hurting on his left side, lower back.
Plaintiff testified that he continued to work until about 6:20 or 6:30, at which time he informed his supervisor, Jim Henson. Plaintiff testified that he left work at 8:30 or 8:40 p.m. (before completing his shift).
Henson filled out an accident report on plaintiff the day after the alleged accident, October 9, 1990. However, Henson's testimony contradicted plaintiff's testimony in that Henson denied that plaintiff reported the accident to him on the day that it allegedly occurred.

OPINION
LSA-R.S. 23:1021(1) defines accident as follows:
"(1) `Accident' means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration."
Amended by Acts 1989, No. 454, § 1, eff. Jan. 1, 1990.
In Rice v. AT & T, 614 So.2d 358 (La.App. 2d Cir.1993), the second circuit concluded that where a worker suffers from a gradually deteriorating or progressively degenerative condition, the legislature did not intend to limit the definition of accident (as amended by Acts 1989, No. 454, § 1) to only extraordinary exertions. The court concluded that "the term accident now includes a weakened condition which collapses due to a precipitous event, but does not include a weakened condition which gradually degenerates over time.... the key requirement under the amended definition of accident is that the event directly produced sudden objective findings of an injury rather than being merely a manifestation of a gradual deterioration or progressive degeneration." 614 So.2d at 361.
The court in Rice found that an accident occurred where the plaintiff, who had a history of back troubles, testified that she felt a tightness in her back as a result of attempting to push her chair closer to the assembly line while at the same time twisting and turning to reach parts to be installed. The court in Dyson v. State Emp. Group Ben. Program, 610 So.2d 953 (La.App. 1st Cir. 1992) found that an accident occurred where plaintiff testified that she began feeling very light pain in her feet approximately one month after taking on her new responsibilities which required her to stand all day except during breaks and further testified that she felt very sharp pain "shoot" through her feet as she turned or pivoted to pick up a large bundle of copies. But see Smith v. UNR Home Products, 607 So.2d 898 (La. App. 2d Cir.1992), reversed on other grounds and remanded, 614 So.2d 54 (La.1993).
In the case before us, accepting plaintiff's testimony as true, we find that the incident plaintiff described meets the definition of "accident" as amended by Acts 1989, No. 454 § 1.
However, the hearing officer did not find plaintiff credible. The plaintiff-worker in a compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. Bruno v. Harbert Intern., Inc., supra. A *338 worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. Bruno, supra. In evaluating the evidence, the trier of fact should accept as true the uncontradicted testimony of a witness, even though the witness is a party, at least in the absence of circumstances in the record casting suspicion on the reliability of this testimony. West v. Bayou Vista Manor, Inc., supra; Bruno, supra. The reviewing court must give great weight to the factual conclusions arrived at by the trier of fact, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may feel that its own evaluations and inferences are as reasonable. Cadiere v. West Gibson Products Co., Inc., 364 So.2d 998 (La.1978); West, supra. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, 549 So.2d 840 (La.1989). In West, supra, the supreme court identified a third factor that limits the deference due the trier of fact: "the appellate court is not required by [the manifest error/clearly wrong] principle to affirm the trier of fact's refusal to accept as credible uncontradicted testimony ... where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles." West, supra, 371 So.2d at 1150; Bruno, supra, 593 So.2d at 361.
The hearing officer listed two examples of false statements made by plaintiff to support his finding that plaintiff lacked credibility:
1. Plaintiff listed Wilson Chapman on the accident report (D-7) as a witness to the accident. At the hearing, however, Chapman denied any knowledge of an accident. Therefore, the hearing officer found that plaintiff made a false statement, casting doubt on his credibility.
The accident report is a preprinted form with spaces for witness' names. Plaintiff supplied Chapman's name to Henson, who filled out the accident report. When asked whether he told Henson that Chapman had actually witnessed the accident, plaintiff stated that he told Henson that Chapman was helping him move the lumber. Henson testified that plaintiff said Chapman witnessed the accident. Henson stated that he never talked to Chapman.
Plaintiff testified at the hearing that (when he was allegedly injured) he kind of looked over at Chapman and told him that he had to go talk to Henson. Plaintiff stated, "I said, I... kind of felt a little pain ... on that." (Later in his testimony plaintiff did not recall whether he told Chapman he hurt his back.) However, plaintiff also stated that there was a lot of noise and he did not think Chapman heard him. The hearing officer then asked whether plaintiff was saying that he did not believe that Chapman saw the accident. Plaintiff stated, "Well, he was on the other end of the boards. It took two people to do it with and so he was on the other end." The hearing officer also asked, "In other words, he did not notice your getting hurt?" Plaintiff replied, "Right. He didn't notice."
Chapman testified that he recalled working with plaintiff in the early part of October 1990. He neither confirmed nor denied that he was working with plaintiff or that plaintiff manually moved lumber on three occasions on October 8, 1990. Rather, he stated that he did not see and plaintiff did not tell him that he got hurt while Chapman was working with him. Chapman also stated that he did not realize that plaintiff had some type of disability or injury.
This evidence reasonably supports a finding that plaintiff did not appreciate the meaning of the term "witness" and was unintentionally inaccurate rather than deceptive in labeling Chapman as a witness. Without more, we do not find that the hearing officer's inference that plaintiff fraudulently listed Chapman as a witness is reasonable.
*339 2. The hearing officer found that plaintiff gave incorrect medical information to Dr. Polixeni Georgiades, who conducted a preemployment physical examination of plaintiff. This finding is based on a letter from Dr. Georgiades dated April 14, 1992, almost two years after the pre-employment physical, and is addressed to defense counsel's law firm. In the letter (D-4), Dr. Georgiades stated:
"Mr. Richard was seen at my office on 4-20-90 for a physical examination for pre-employment physical for Temple-Inland. He gave a history of a pulled muscle and lumbar strain 2 months prior to seeing me. He was under the chiropractic care of Dr. Kibler in DeRidder and was discharged 3 weeks prior to having his physical. He stated he was doing fine and having no problems. Examination of his back revealed no abnormalities. There was no limitation of back motion, no pain or tenderness on Valsalva maneuver, no limitation of straight leg raising, superficial and deep tendon reflexes, normal. No sensory changes. Flexion (forward, backward, lateral extensionnormal. X-ray of lumbo-sacral spine was Normal. The rest of his physical examination was normal." (Emphasis added).
In fact, plaintiff was not discharged from Dr. Kibler's care at that time but was being treated for back injuries received in the March 1, 1990 automobile accident. Plaintiff saw Dr. Kibler eight times in March and eight times in April 1990. Accordingly, the hearing officer found plaintiff made a false statement to Dr. Georgiades.
However, the record contains a Temple-Inland medical record (P-5), which plaintiff completed and signed at the time of the physical examination. In that medical record, he disclosed the back injury and current treatment of his back. The medical record contains a section for medical history which asks "HAVE YOU EVER HAD OR DO YOU NOW HAVE:" and lists forty-six conditions or diseases. Of these conditions or diseases, plaintiff checked "yes" for "BACK INJURY." He checked all other items "no." The form also asks "HAVE YOU HAD ANY ILLNESSES OR INJURIES OTHER THAN THOSE LISTED ABOVE?" to which plaintiff answered, "Pull [sic] muscle in mid-Part of Back." The section also asked "WHAT ILLNESSES, INJURIES OR OPERATIONS HAVE YOU HAD IN THE PAST FIVE YEARS?" to which plaintiff answered, "Lower Back." Also asked: "ARE YOU NOW UNDER A DOCTOR'S CARE FOR ANY CONDITION?" to which plaintiff responded "[chiropractic] care. Dr. R.H. Kibler, DeRidder, LA."
Plaintiff testified that when Dr. Georgiades gave him the physical examination, "[he] told her [his] back was feeling well, but the chiropractor hadn't released [him]."
We have not resolved the conflict between Dr. Georgiades's statements in the letter (D-4) with the information apparently provided to her in the medical record (P-5) and plaintiff's alleged statement to her. The record contains no hearing or deposition testimony by Dr. Georgiades.
Without more, we cannot agree with the hearing officer's use of Dr. Georgiades's letter as a basis for finding plaintiff lacked credibility.
Defendant lists in its brief other allegedly false statements and inconsistencies. We will assume these are, at least in part, the other examples of false statements found by the hearing officer.
1. Defendant asserts that plaintiff was untruthful on his employment application with defendant when he indicated that he had never drawn workers' compensation, despite the fact that Harkin, plaintiff's previous employer, had paid plaintiff's medical bills for injuries arising out of plaintiff's employment with Harkin. Plaintiff testified at trial that he did not consider that he was receiving workers' compensation benefits at that time. He stated that:
"I've been told that it's something that the employer pays an individual, if he's hurt on a job. Pays his medical and then supplies some kind of an income to him, is what I gathered."
Plaintiff received medical benefits only; he did not discontinue working, and he did not receive income benefits. It also does not *340 appear that plaintiff had experience making workers' compensation claims prior to his injury at Harkin.
Additionally, it appears that a representative of Harkin also did not consider plaintiff's receipt of medical benefits to constitute a workers' compensation case. Donna Koonce, defendant's human resource and accounting coordinator, testified:
"Okay. When he was sent for the second opinion, to Dr. Shaheen, after the alleged injury, that accident, Dr. Shaheen called me and said, Donna, he was injured before he went to work for you. Who did the physical? And I went to his file and pulled the physical out and saw it. Well, when I talked to thewhen I had checked the references out, on the first, there was never any mention of that and so I called and checked the references again with this Nancy, and I said, I had called you back in April and asked you about this employee and type of employee he was and you said he was dependable, safety mined [sic] and basic [sic] a good employee and that's all she said. And I said, did you have any problems, at any time, with him? Was there any injury? And she said, oh, well, there was an injury and I said, was it a workmen's case and she said, no. She said, we paid the medical bills, and that's why that is there, because I had to call and verify, due to the application, that Dr. Shaheen had stated he was under workmen's comp and he had stated on my application that he was not." (Emphasis added).
Again, plaintiff's failure to indicate that he received benefits appears to us to be nothing more than a misunderstanding of the term "worker's compensation" rather than an attempt to deceive defendant. There was no sound reason to reject plaintiff's testimony in this regard.
2. Plaintiff was untruthful on his employment application when he indicated that he had never been seriously injured or ill, when in fact plaintiff was under the care of a chiropractor at the time. Plaintiff testified that he thought that the question "meant whether you were disabled, where you can't walk, or you're in a wheelchair or ... can't perform any kind of work; seriously injured...." Also, plaintiff disclosed on the medical record for the preemployment physical that he had a back injury and was under the care of Dr. Kibler. The evidence does not support that plaintiff attempted to deceive or mislead defendant in that regard.
3. Plaintiff was untruthful on his employment application when he indicated there were no limitations on his ability to perform his job, when he was under treatment for a back injury. We have found nothing in the record indicating that Dr. Kibler imposed any work restrictions on plaintiff at the time of the employment application. Furthermore, Dr. Georgiades passed plaintiff on his preemployment physical. It also appears that plaintiff worked regular duty for defendant from April 27, 1990 until the date of the accident without difficulty. Any inference of untruthfulness on plaintiff's part in regard to this application question is not supported by the record.
4. Plaintiff was untruthful on his application for unemployment benefits after he was terminated by defendant when he represented that he was physically able to go to work although he was still under a chiropractor's treatment. We do not find this unemployment benefits application in the record, but we note that on pages 107-108 of the record, defendant's attorney asked that plaintiff sign a release for the unemployment records and that the record be left open for introduction of those records. In any event, the record does not reveal that plaintiff's doctors restricted him from all work; rather, plaintiff was restricted to light duty work. Indeed, he has performed some work since the alleged accident. Allegations of untruthfulness in this regard are not supported by the record.
5. Plaintiff was untruthful when he testified that he was not referred to Dr. Steiner by his attorney, but by a friend. Dr. Steiner testified that he believed plaintiff's attorney referred plaintiff to him. However, this inconsistency is insufficient to support a conclusion that plaintiff lacked credibility.
6. Plaintiff was untruthful when he testified that Dr. Kibler was not treating him for his low back at the time he applied for *341 employment with defendant. Plaintiff testified at the hearing that Dr. Kibler was treating him for cervical as well as "mid low back" but denied that Dr. Kibler was treating him for low back pain when he went to work for defendant in April 1990. Dr. Kibler stated that he was treating plaintiff for his low back pain as well. We find this inconsistency insufficient to support a finding that plaintiff lacked credibility.
7. Plaintiff was untruthful when he testified that he quit his job in Houston selling cars because his back bothered him, when he quit because he and his fiancee broke up and plaintiff wanted to move back to Louisiana. Plaintiff did testify that he told his general manager at the car dealership that he was quitting because his back was bothering him and because he and his fiancee broke up. The record does not support defendant's assertions to the contrary.
8. Plaintiff was untruthful in his answers to interrogatories when he failed to indicate that he had worked and received wages from a job in Texas. Plaintiff testified that at the time, he did not think of it. This is insufficient to support a finding that plaintiff intended to mislead or supply false information.
This is not the situation in which the claimant has had considerable experience making workers' compensation claims so as to substantially detract from his credibility. See Hand v. Reeves, 378 So.2d 1064 (La.App. 2d Cir.1979), writ denied, 380 So.2d 72 (La. 1980). Nor is this a case in which plaintiff's credibility has been thoroughly impeached. See Jones v. Alexander, 399 So.2d 216 (La. App. 2d Cir.), writ denied, 400 So.2d 1383 (La.1981); Crochet v. American Tobacco Co., 407 So.2d 1330 (La.App. 3d Cir.1981). Also, this is not a case in which the claimant's testimony is not supported by other corroborating evidence, either as to the occurrence of the accident or the disability. See Jasmin v. St. James Parish School Bd., 606 So.2d 15 (La.App. 5th Cir.), writ denied, 607 So.2d 568 (La.1992).
Plaintiff's testimony is supported by other corroborating evidence. His mother, Hazel Richard, testified that plaintiff went to her house when he sustained the injury and that he was "walking all humped over, holding his side in the back." She stated that he did not walk that way before the accident at any time that she knew.
Also, the nature of plaintiff's job could have placed him in a situation to sustain such an injury. It appears that plaintiff had to manually move green lumber at some point. Plaintiff testified that these boards were two by sixes, two by eights, and two by twelves. He stated that the longest length of board they had was twenty feet long and estimated that the weight of a twenty foot board was one hundred and twenty or one hundred and thirty pounds.
Additionally, the medical evidence corroborates plaintiff's testimony. Plaintiff gave a history of the alleged accident to Dr. Kibler and Dr. David Steiner, an orthopedic surgeon. Plaintiff saw Dr. Kibler the day after the accident. Dr. Kibler had just seen plaintiff on October 5, 1991 (three days prior to the accident) for care or treatment in connection with the injuries he received in the March 1, 1990 automobile accident and had been under Dr. Kibler's care since the automobile accident. However, Dr. Kibler testified that he was treating plaintiff for injuries all the way from C5-L4, including T5, T6, T7, and T8 following the automobile accident; following the Temple-Inland accident he was treating him at T9 and T10 and diagnosed plaintiff with subluxation (malposition of a vertebra) of the ninth thoracic vertebra and low back. Dr. Kibler testified that following the automobile accident, he found plaintiff had problems in his cervical spine and low back. He stated that by the date of the Temple-Inland accident, plaintiff's low back injury had apparently resolved itself; it was no longer a priority, but Dr. Kibler had been treating plaintiff for a cervical problem.
Dr. Kibler also stated that he had no doubt but that the injury for which he treated plaintiff was sustained on October 8, 1990. He also agreed that it was very likely or very possible that the alleged accident aggravated a condition that was already there. He stated, however, that all he had to go on in relating any of the treatment to the accident was what plaintiff told Dr. Kibler and the *342 defendant. Dr. Kibler released plaintiff to light duty work, which restriction was in effect at the date of the hearing. Prior to the alleged October 8, 1990 accident, it does not appear that plaintiff was restricted to light duty work.
Plaintiff also saw Dr. Harry L. Shaheen following the Temple-Inland accident. However, the record contains no testimony from Dr. Shaheen. The record contains a letter from Dr. Shaheen (D-2) which states in part that he saw plaintiff on October 23, 1990 and that x-rays of plaintiff's lumbo sacral spine were all within normal limits. Plaintiff also testified that he saw Dr. Todd Smith, a chiropractor, for injuries received in the alleged accident; the record does not contain testimony from Dr. Smith.
Plaintiff also saw Dr. Steiner following the alleged accident. His initial visit was on October 9, 1991. X-rays were taken which revealed some narrowing of the L4 space and only minimal arthritic changes. Dr. Steiner was of the opinion that plaintiff had some lumbar disk disease at the L4-5 level. He stated that what he saw on the x-rays was "consistent with what [plaintiff] said."
Plaintiff returned to Dr. Steiner on April 10, 1992, with x-rays taken on April 20, 1990, the date of his preemployment physical. The spine appeared normal in these x-rays, which Dr. Steiner compared with x-rays taken in his office on October 9, 1991, which showed some narrowing of the L4 disc. Dr. Steiner testified that he generally does not look at narrowing at L4 and minimal arthritic changes as consistent with plaintiff's age of twenty-eight. Dr. Steiner recommended an MRI and physical therapy and restricted plaintiff to light duty work.
We do note the following evidence appears unfavorable to plaintiff's claim. Concerning the x-rays, Dr. Steiner stated that plaintiff did have a history of having had a back injury in 1989 (it does not appear that plaintiff informed him of the automobile accident) and that the effect of many of these things can be "additive." Dr. Steiner noted that it takes time for these changes to take place on an x-ray so that it is difficult to look at an x-ray and make an assessment of what particular time that change began to occur. He stated that he found no objective signs of injury.
Also, plaintiff testified about the conversations he and his supervisor, Henson, had concerning the injury on the evening he allegedly had the accident. However, Henson denied that plaintiff told him about the accident on the evening the accident allegedly occurred and stated that plaintiff did not report the accident to him until the next day.
The evidence also indicates that plaintiff had been warned about two weeks before the alleged accident that his employment would be terminated if he incurred two more unexcused absences (apparently, defendant's policy was to terminate employment if six unexcused absences were incurred within a calendar year).
Finally, plaintiff received injuries to his back on two separate occasions prior to the alleged Temple-Inland accident.
However, despite this evidence, there was sufficient evidence to prove by a preponderance of the evidence that the injury did occur at Temple-Inland as plaintiff testified. In this regard, see generally Nelson v. Roadway Exp., Inc., 588 So.2d 350 (La.1991); Bruno, supra; and Ceasor v. Belden Corp., 536 So.2d 1261 (La.App. 3d Cir.1988).
Additionally, an employee's preexisting disease or infirmity does not disqualify his workers' compensation claim if the work-related injury either aggravated, or combined with, the disease or infirmity to produce the disability for which compensation is claimed. When a claimant proves that before the accident he had not manifested disabling symptoms, but that commencing with the accident, the disabling symptoms appeared and manifested themselves thereafter, and that there is either medical or circumstantial evidence indicating a reasonable possibility of causal connection between the accident and the activation of the disabling condition, a claimant's work injury is presumed to have aggravated, accelerated or combined with any preexisting disease or infirmity to produce his disability. Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App. 2d Cir.1991).
*343 Concerning disability, it is clear that plaintiff is capable of performing some work. He returned to Temple-Inland, following the accident, in a light duty capacity but was dismissed for excessive unexcused absences. Additionally, plaintiff has worked at a car dealership selling cars and has done some house washing (pressure washing) since the accident. According to the medical testimony, he was restricted to light duty.
We remand for the introduction of evidence on the issue of disability and for disposition of the claim accordingly.

DISPOSITION
For the foregoing reasons, we reverse the hearing officer's finding that plaintiff failed to prove he sustained an injury in a work related accident. We remand for a determination of the extent of plaintiff's disability and appropriate disposition of plaintiff's claim. We assess costs to defendantTemple-Inland.
REVERSED and REMANDED.